Filed 3/11/21  P. v. Ponce CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ADRIAN JOSEPH PONCE,<br><br>        Defendant and Appellant. | A155368<br><br>(Contra Costa County<br>Super. Ct. No. 051702232) |

Defendant appeals from a judgment after a jury trial finding him guilty of possession of heroin for sale, possession of methamphetamine for sale, possession of firearms as a felon, and possession of controlled substances while armed, and finding true gang enhancements and firearm enhancements.  Defendant contends:  (1) the evidence was insufficient to support the gang enhancements; (2) the trial court committed sentencing error regarding the firearm charges; (3) he is entitled to a remand for a hearing to determine whether he has the ability to pay the fines and fees imposed on him; and (4) the abstract of judgment must be modified to reflect his 588 days of custody and conduct credits.  We find that the judgment must be modified to stay portions of defendant's sentence regarding the firearm enhancements and to correctly reflect the custody and conduct credits.  We affirm the judgment as modified.

1

## I. *Prosecution Case*

### A. *Arrest of Raymon Ponce*

Defendant's brother, Raymon Ponce, was arrested on January 7, 2017, during a traffic stop. Raymon[1] was a passenger in the car, which was registered to him at an address in Pittsburg, but his driver's license listed a West 19th Street, Antioch, address. Raymon and another passenger in the car both had CAL tattoos.[2] Raymon was wearing red shoes and a black jacket with red accents. During a search of the car, police officers discovered narcotics paraphernalia; $2,097 in cash; and eighteen .22-caliber bullets.

### B. *Search of Defendant's Home*

On January 19, 2017, in connection with an ongoing investigation of Raymon, Detective Souza, of the Concord Police Department,[3] executed a search warrant at defendant's home on West 19th Street in Antioch. The defendant and a woman later identified as R.D. were found in the bedroom and detained in handcuffs. Two small children were also at the residence. Detective Souza found a .22-caliber rifle in the bedroom, .22-caliber ammunition in the kitchen and the bedroom, a butt stock for an AR-15 rifle in the bedroom, and a loaded handgun in the kitchen. Detective Souza also found a half-full box of .40-caliber ammunition. Next to the box of

---

[1] To avoid confusion, we refer to defendant's brother by his first name. We intend no disrespect.

[2] Detective Souza later testified as a gang expert and explained that CAL is a subset of the Norteños criminal street gang.

[3] Detective Souza worked in the Violence Suppression Unit and was assigned to the Federal Bureau of Investigation's Safe Streets Task Force. He was also in charge of an operation called Omega Red, designed to disrupt the Norteños criminal street gang and to prevent violence in Contra Costa County, and which involved a wiretap of Norteños gang members.

ammunition, he found a rubber-banded stack of money totaling about $5,100. The police found additional sums hidden in picture frames. A total of about $69,000 was discovered.

In the bedroom closet and dressers, the police found numerous articles of red clothing, including pants, a red San Francisco Giants hat, a Raiders hat with a red logo, hooded sweatshirts and tee shirts. Above the bed, the police noticed a large "Raiders-style flag" with the *huelga* bird logo in the background. Also in the bedroom closet, the police found a shoebox containing approximately 50 letters from prison or jail inmates, some of whom the police knew to be members of the Norteños street gang. Most of the letters were addressed to defendant. The letters also included money orders, which Detective Souza explained can be used to fund inmates' accounts in prison. In some of the letters, gang members thanked defendant for supplying them with funds.

In the kitchen, the police discovered a backpack containing a pound of heroin and a pound and a quarter of methamphetamine. The police also found a blender, a digital scale and plastic baggies. They did not find, however, any drug user paraphernalia. A phone charger with "XIV"[4] and "CAL" inscribed on it in red ink was also found in the kitchen.

The police did not find any photographs of defendant flashing gang signs. Further, he had not sustained any prior convictions for gang-related activity. Defendant had two tattoos, one of his name, " 'Ponce,' " and the other of an Oakland Raiders symbol. " '19th Street Mob' " and " 'Ponce' " were carved in the sidewalk outside of defendant's home.

---

[4] Detective Souza testified that "XIV" is a symbol of the Norteños criminal street gang.

3

C.     *Phone Call Between Defendant and J.Q.*

Sergeant Matthew Koch, of the Antioch Police Department, testified that during 2016, he participated in a federal wiretap operation into drug trafficking and that J.Q. was one of the subjects.[5] The wiretap recorded an August 20, 2016 call between J.Q. and defendant, which was played for the jury. Detective Souza, who knew J.Q. was a convicted Norteños drug dealer, reviewed the recorded call as part of his investigation of defendant. During the call, J.Q. and defendant discussed distribution of the profits of drug sales. Detective Souza explained, "Based upon the context of the call, [it] appear[ed] that [J.Q.] owe[d] [defendant] in some way," and that defendant was angry. Defendant asked J.Q., "Do you want to pay me or take it to another level?" Detective Souza explained that within the context of gangs, the phrase "take it to another level" usually means "violence, a fight, or . . . talk[ing] to someone higher up about it." After some back and forth, J.Q. responded, "Let's figure out how to do this." At one point, defendant referenced being "dry," which Detective Souza explained means being out of whatever drug a dealer is selling. Defendant stated, "Pig but [*sic*] me under," and, "I am fucking struggling too. All these people got locked up with my shit." Detective Souza testified that he knew a "self-admitted . . . Norteno gang member" who used the moniker "Pig" and that the recorded phone call took place shortly after several Norteños gang members were arrested on

---

[5] J.Q. had a prior conviction which included a gang enhancement finding that he had committed a crime for the benefit of the Norteños gang. Sergeant Koch testified that he believed J.Q. to be a member of the Norteños gang. Officer Josh Reddoch, of the Pittsburg Police Department, testified that during a probation search of J.Q.'s home in 2010, police found a photo of J.Q. and another Norteños gang member holding a red *huelga* bird flag, which Officer Reddoch stated is "basically the logo for the Norteno criminal street gang."

August 3, 2016, as part of the Omega Red investigation.  Defendant asked J.Q., "I just want to know when I am going to get my dough."  J.Q. responded, "As long as you on deck, we can start pushing it today.  Just hit me up."  Defendant then agreed to sell to J.Q. for "850," which he said was a discount, and the call ended with J.Q. agreeing to pay defendant "$5, $10 here, [¶] . . . [¶] $20 bucks here" until it "add[s] up."

Detective Souza testified that he understood the phone call to be "[o]ne gang member providing another gang member with narcotics to sell on his behalf and getting the profits to the other gang member . . . ."  He explained this would benefit the gang because "[b]oth the supplier and seller are members of the Norteno street gang, both are backed by the overall Norteno gang organization . . . , which would intimidate other people who would potentially rob either party . . . [and] comes with the protection of the overall gang, and [is] also basically [a] built-in way to distribute the drugs through other gang members."

D.    *Phone Call Between Defendant and Raymon Ponce*

Detective Souza testified about a phone call between the defendant and his brother Raymon, which was recorded while the defendant was in jail.  During the call, the defendant and his brother discussed an inmate named "Mando," whom Detective Souza understood to be Amando Amaro, one of the targets of the Omega Red wiretap investigation.  Amando Amaro has a " 'Cal' " tattoo on his neck and an " 'SK' " tattoo on his wrist.  Detective Souza explained that "SK" is a term used by Norteños to mean " 'scrap killer' " and that "scrap" refers to a rival gang member.[6]  Defendant told his brother that

---

[6] In addition, Detective Hoffman testified that Amando Amaro was a CAL gang member whom he had investigated and arrested for gang-related offenses.

5

he was trying to be Amaro's cellmate. Detective Souza deemed defendant's desire to be housed with Amaro significant because, in his experience, "a Norteno gang member will want to be housed with another Norteno gang member, . . . in the same cell together. [A] Norteno's not going to allow a rival gang member or someone who's not a gang member to share a cell with them."

Defendant also referred to Robert Wickham by his moniker, "Rojo." Wickham was another inmate whom Detective Hoffman had investigated and whom Detective Hoffman concluded was a CAL member based on photographs of Wickham displaying CAL hand signs. Defendant told his brother that Wickham referred to defendant as "[m]y nigga from 19th" and that Wickham and others referred to him as "OG." Detective Souza explained "OG" means original gangster and is used to denote an older member of a gang.

Defendant also referred to "Chubz," whom Detective Souza knew to be Oscar Torres, a self-admitted Norteños gang member.

E. *Gang Expert Testimony*

Detective Souza testified as an expert in areas of the Norteños criminal street gang in Contra Costa County and the possession of narcotics for sale. He explained that the Norteños gang originated in Northern California prisons and was originally called La Familia and later Nuestra Familia. The gang associated with the color red and the number 14, which represents the letter *N*. It also adopted the *huelga* bird as a symbol. Some members got tattoos to instill fear in rival gang members and in the community, but others chose not to get tattoos because "they want[ed] to fly under the radar" with law enforcement.

Detective Souza testified that Norteños members move up the ranks by engaging in criminal activity, including shootings, robberies, prostitution and selling drugs. Norteños typically pay "taxes" to other Norteños "by putting money on [an] individual's books," which means depositing funds in an inmate's commissary account.

Detective Souza explained that "CAL" stands for "Crazy Ass Latinos" and that CAL is a subset of the Norteños in the Antioch, Brentwood, and Oakley areas. CAL members engage in criminal activity, including robbery, drug sales, and prostitution, to make money.

Detective Souza concluded that defendant was a member of the Norteños gang. He based his opinion on several factors, including "red clothing located inside of his home, the jail letters to other Nortenos street gang members who are incarcerated, the Huelga bird flag located inside of his home, and also . . . a phone charger inside of his home which was marked 'X4' and 'CAL' . . . , both signs and symbols of the Norteno criminal street gang." Detective Souza further testified that his opinion was based on the two firearms found in defendant's home, which are commonly possessed by members of the Norteños street gang, and the fact that defendant associated with Norteños criminal street gang members as indicated in the phone call to defendant's brother and in defendant's phone call to J.Q.

The prosecutor posed the following hypothetical to Detective Souza: "If a person has red clothing in their residence, including a red Oakland Raider hat and red San Francisco Giant hat and other items of red clothing, has jail letters from other Norteno drug dealers and other Nortenos, has a Huelga bird above his bed, has a phone charger with gang 'XIV' and 'CAL' inscribed on it, has sidewalk markings demarcating his territory outside of his house, is in possession of a loaded firearm with an extended magazine and a speed

7

loader, as well as a rifle, is talking to Norteno drug dealers on phone intercepts, and is currently in custody associating with Norteno gang members, and in his house when he was arrested, there was a pound of heroin, a pound of methamphetamine, do you have an opinion if these crimes were committed for the benefit of or in association with the Norteno criminal street gang?" (*Sic.*)

Detective Souza opined that the crimes were committed for the benefit of and in association with the Norteños gang. Given the large amount of drugs and the fact that the person in the hypothetical communicated with Norteños drug dealers, Detective Souza concluded the person "could be the source of supply for other Norteno criminal street gang members. [¶] . . . [T]his is helpful for the Norteno criminal street gang because multiple members of the gang could now be producing revenue for the gang itself. This revenue can be used to acquire weapons, could be used to put money on incarcerated other gang members' books . . . to live a more comfortable lifestyle in jail . . . , and it could be also used to acquire more drugs for the gang so that they could profit further from their drug enterprise."

## II. *Defense Case*

Dr. Rahn Minagawa, a clinical and forensic psychologist, testified as an expert in criminal street gang culture. Minagawa testified that children who are exposed to street gangs gravitate toward them and befriend their members. They then start to work on behalf of the gang and become associates and may later enter the gang as members. Law enforcement may erroneously profile family members or friends of gang members as gang members themselves. By itself, a person's relationship with a family member who is part of a street gang does not establish that that person is a gang

8

member. However, Minagawa acknowledged that active gang members tend to associate with other active members of the same gang.

Minagawa explained that it is common for Norteños gang members to help incarcerated colleagues by putting money on their books in prison. However, he also stated that a person may provide financial assistance to an incarcerated family member or friend who is a gang member for personal reasons and not for the benefit of a gang. Minagawa testified gang members demonstrate their pride in their gang with gang-related tattoos and by flashing gang signs among themselves, to perpetuate gang unity.

Minagawa was presented with a hypothetical including the facts of defendant's arrest, and he opined that "it [did not] appear to [him] that . . . those drugs or guns [were] tied directly to the gang" and that it was "very unlikely" that they were possessed for the benefit of a criminal street gang.

## DISCUSSION

### I.    *Substantial evidence supports the gang enhancements.*

Defendant contends insufficient evidence supports the jury's true findings on the Penal Code section 186.22, subdivision (b)(1)(A)[7] criminal street gang enhancements associated with count 1 (possession of heroin for the purpose of sale; Health & Saf. Code, § 11351), count 2 (possession of methamphetamine for the purpose of sale; Health & Saf. Code, § 11378) and count 6 (possession of a controlled substance while armed with a firearm; Health & Saf. Code, § 11370.1, subd. (a)).

Section 186.22, subdivision (b)(1) provides a sentence enhancement for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific

---

[7] All statutory references are to the Penal Code unless otherwise stated.

intent to promote, further, or assist in any criminal conduct by gang members . . . ."

The substantial evidence standard applies to gang enhancement findings. (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60.) Substantial evidence is " 'of ponderable legal significance[,] . . . reasonable in nature, credible, and of solid value' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576), and may include "[c]ircumstantial evidence and reasonable inferences drawn therefrom . . . ." (*In re James D.* (1981) 116 Cal.App.3d 810, 813; see *People v. Miranda* (2011) 192 Cal.App.4th 398, 411 ["There is rarely direct evidence that a crime was committed for the benefit of a gang"].) When reviewing sufficiency claims, appellate courts do not reweigh the evidence or reassess the credibility of witnesses, and they "must accept logical inferences that the jury might have drawn from the evidence even if [they] would have concluded otherwise." (*People v. Combs* (2004) 34 Cal.4th 821, 849; *People v. Alvarez* (2009) 178 Cal.App.4th 999, 1004.) Reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Defendant argues specifically that there was no evidence that the proceeds from his drug sales went to a street gang or that he intended to act as a drug supplier for a street gang. He admits that he "engaged in drug transactions with [J.Q.], a Norteno gang member," but asserts that there is no evidence that those transactions were gang-related or that the drug sales would benefit the gang. Defendant contends his "collected correspondence" with incarcerated gang members fails to establish that he had the mental state required to support the gang enhancements, and instead is simply evidence that he associated with gang members. Likewise, defendant argues

that the fact that his home "included gang indicia and that gang graffiti existed close to his residence" only supports an inference that he "was attracted to gangs [but] does not prove that he possessed the requisite mental state." According to defendant, there was insufficient foundation for Detective Souza's expert opinion and, therefore, the opinion cannot support the jury's gang enhancement findings.

We are not persuaded. The foundation for Detective Souza's opinion included evidence indicating defendant's Norteños affiliation in his home, including the *huelga* flag, the red clothing, the phone charger with CAL markings, as well as the sidewalk carving stating " '19th Street Mob' " and " 'Ponce.' " In addition, there was correspondence between defendant and multiple incarcerated Norteños gang members indicating that defendant was supplying them with funds while they were incarcerated. Further, defendant spoke with J.Q., a convicted Norteños drug dealer, and discussed defendant's supplying drugs for J.Q. to sell. During the call, defendant complained he was "struggling" because "[a]ll these people got locked up with my shit." Detective Souza explained that the recorded call occurred shortly after several Norteños gang members were arrested as part of the Omega Red investigation. While in jail, other Norteños gang members referred to defendant with terms of respect, and defendant said he wanted to be housed with another Norteños gang member. Based on this evidence, Detective Souza opined that defendant was a Norteños gang member, and in response to a hypothetical paralleling the facts here, Detective Souza believed the crimes were committed "for the benefit of and in association with the Norteno criminal street gang[.]" He explained that supplying other Norteños gang members with drugs provides revenue for the gang that could be used to buy weapons, fund incarcerated members' lifestyles, and acquire more drugs. We

11

find substantial evidence supports the jury's conclusion that defendant specifically intended to promote, further or assist criminal conduct by gang members by possessing methamphetamine and heroin for sale, and while armed.

Defendant relies upon *People v. Ramon* (2009) 175 Cal.App.4th 843 for the position that "the mere fact that two gang members have engaged in criminal conduct even in their own territory does not establish that their conduct is gang related within the meaning of section 186.22, subdivision (b)(1)." In *Ramon*, the defendant was convicted of receiving a stolen vehicle and possession of a firearm by a felon. (*Id.* at p. 846.) *Ramon* held that evidence the perpetrators were gang members and that the crimes were committed in the gang's territory was insufficient to support the gang enhancement. (*Id.* at p. 851.) However, the court specifically noted that its "analysis might be different if the [gang] expert's opinion had included 'possessing stolen vehicles' as one of the activities of the gang." (*Id.* at p. 853.) Here, Detective Souza testified that one of CAL's "primary activit[ies]" is "drug sales," which makes money for the gang, and that Norteños "[move] up the ranks" by "putting in work for the street gang," which can include "selling drugs." Detective Souza's testimony, and the facts upon which it was based, including that defendant communicated with another Norteños gang member about drug dealing and that defendant sent money to incarcerated Norteños gang members, is sufficient to support the jury's gang enhancement true findings. (See *People v. Hunt* (2011) 196 Cal.App.4th 811, 822 [distinguishing *Ramon* where gang expert testified that the gang "committed robberies, in fact, was notorious for doing so"].)

12

## II.     *Defendant Waived* Dueñas *Claim*

At sentencing, the trial court imposed the following fines and fees: $1,500 restitution fine (Pen. Code, § 1202.4, subd. (b)); $1,500 parole revocation restitution fine (*id.*, § 1202.45), suspended unless parole is revoked; $200 court operations assessment (*id.*, § 1465.8); and a $150 conviction assessment (Gov. Code, § 70373).  For the first time on appeal, defendant argues that under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), remand is required because the trial court failed to determine his ability to pay before imposing the fines, fees, and assessments.[8]  We conclude that defendant forfeited this argument.

Defendant concedes that at sentencing his trial counsel did not assert inability to pay any of the fines, fees, or assessments.  A timely objection below was required to preserve this claim.  (See *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153 (*Frandsen*) [concluding that the defendant forfeited challenge where his trial counsel failed to object to assessments or restitution fine at sentencing]; *People v. Trujillo* (2015) 60 Cal.4th 850, 859 [explaining that constitutional nature of defendant's claim regarding his ability to pay did not justify a deviation from the forfeiture rule].)

Defendant fails to show an applicable exception to the doctrine of forfeiture.  We disagree with his argument that forfeiture does not apply because the legal argument raised in *Dueñas* was not recognized at the time of defendant's sentencing.  As explained in *Frandsen*, "*Dueñas* was foreseeable.  Dueñas herself foresaw it.  The *Dueñas* opinion applied 'the

---

[8] *Dueñas* held that due process of law requires an ability to pay hearing and a determination of present ability to pay before a court imposes assessments under Penal Code section 1465.8 and Government Code section 70373, or executes a restitution fine under Penal Code section 1202.4. (*Dueñas, supra*, 30 Cal.App.5th at p. 1164.)

*Griffin–Antazo–Bearden* analysis,' " flowing from cases *Griffin v. Illinois* (1956) 351 U.S. 12, *In re Antazo* (1970) 3 Cal.3d 100, and *Bearden v. Georgia* (1983) 461 U.S. 660. (*Frandsen, supra*, 33 Cal.App.5th at p. 1154, quoting *Dueñas, supra*, 30 Cal.App.5th at p. 1168.) *Dueñas* likewise observed, " 'The principle that a punitive award must be considered in light of the defendant's financial condition is ancient.' " (*Dueñas*, at p. 1171.) Accordingly, "*Dueñas* applied law that was old, not new." (*Frandsen*, at p. 1155.)

Even assuming no forfeiture, we would conclude any error under *Dueñas*[9] was harmless beyond a reasonable doubt. (*People v. Johnson* (2019) 35 Cal.App.5th 134, 139–140.) A defendant's ability to pay is not limited to his or her present financial situation but can also be based on his or her future ability to earn prison wages and money after release from custody. (*People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837.) Here, the record shows that defendant was 29 years old at the time of sentencing and that he was sentenced to a prison term of 13 years. The total amount of the challenged fines, fees, and assessments is $1,850 (the $1,500 parole revocation fine is suspended). Nothing in this record indicates defendant will be unable to work or ineligible for prison work assignments. Even assuming defendant had no available assets at the time of sentencing, he will have ample time to pay the $1,850 assessed against him from his prison wages. (*People v. Johnson, supra*, at pp. 139–140.)

---

[9] Courts have strongly criticized the substantive holding in *Dueñas*. (See, e.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, 326–329, review granted Nov. 26, 2019, S258946.) We need not offer our opinion regarding the *Dueñas* holding because we conclude that, on this record, any possible error (even if not forfeited) was harmless beyond a reasonable doubt.

## III. *Sentencing Issues*

Defendant contests aspects of his sentence relating to his possession of firearms.[10]  We agree that the trial court erred when it imposed concurrent sentences for certain of the allegations related to defendant's possession of firearms.  As we explain, the trial court should have stayed the concurrent sentences related to the firearms to avoid multiple punishment for the same acts.  (*People v. Jones* (2012) 54 Cal.4th 350, 353 [imposing concurrent sentences for the same act constitutes multiple punishments].)  We modify the judgment accordingly.

### A. *Defendant's Sentence*

Defendant was convicted of possession of heroin for sale (Health & Saf. Code, § 11351; count 1); possession of methamphetamine for sale (Health & Saf. Code, § 11378; count 2); possession of a firearm (.40-caliber handgun) as a felon (Pen. Code, § 29800; count 4); possession of a firearm (.22-caliber rifle) as a felon (Pen. Code, § 29800; count 5); and possession of heroin and methamphetamine while armed with a loaded, operable firearm (Health & Saf. Code, § 11370.1, subd. (a); count 6).  In addition, counts 1 and 2 each included three enhancements:  the gang enhancement (Pen. Code, § 186.22, subd. (b)(1)(A)) and a separate firearm enhancement for each firearm (Pen. Code, § 12022, subd. (c)).  The jury found all of the enhancements true.[11]  The court found true the allegation that defendant had sustained a prior serious felony conviction.

---

[10] Defendant also contends the abstract of judgment must be corrected to reflect the 588 days of conduct credit the trial court awarded.

[11] Count 6 also charged a gang enhancement, which the jury found true.

15

Defendant was sentenced to 13 years on count 1 as follows: the midterm of three years doubled to six years because of the prior strike, a consecutive three years for the gang enhancement, a consecutive four years for one firearm enhancement and a concurrent four years for the second firearm enhancement. As to count 2, the trial court imposed the midterm of two years doubled to four years, three years for the gang enhancement, and four years on each firearm enhancement, all to run concurrently to the sentence for count 1. As to counts 4 and 5, the trial court imposed a concurrent sentence of two years for each count. As to count 6, the trial court imposed a concurrent midterm sentence of three years doubled to six years, plus three years for the gang enhancement, but stayed punishment under section 654.

> B. *Section 654 requires that the concurrent sentences imposed for counts 4 and 5 be stayed.*

Defendant argues section 654 prohibits imposition of a concurrent sentence for count 4 (possession of the handgun) because he was punished for the same conduct under the enhancement attached to count 1. He asserts his concurrent sentence on count 4 must be stayed under section 654.[12] The People agree but explain that defendant's concurrent sentence on count 5 must also be stayed for the same reason. In defendant's reply brief, he agrees that his sentences on both count 4 and count 5 should be stayed.

Section 654, subdivision (a) states, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under

---

[12] As defendant notes, the lack of compliance with section 654 results in an unauthorized sentence and may be raised on appeal even if defendant failed to object below. (*People v. Hester* (2000) 22 Cal.4th 290, 295.)

16

more than one provision. . . ." Here, the trial court imposed one consecutive four-year prison term for the first gun enhancement attached to count 1 and imposed a concurrent four years for the second gun enhancement attached to count 1. It then also imposed concurrent two-year terms for counts 4 and 5 for possession of the same firearms. " 'It has long been established that the imposition of concurrent sentences is precluded by section 654 [citations] because the defendant is deemed to be subjected to the term of *both* sentences although they are served simultaneously.' [Citation.] Instead, the accepted 'procedure is to sentence defendant for each count and stay execution of sentence on certain of the convictions to which section 654 is applicable.' [Citations.] Accordingly, although there appears to be little practical difference between imposing concurrent sentences . . . and staying execution on two of the convictions . . . , the law is settled that sentences must be stayed to the extent that section 654 prohibits multiple punishment." (*People v. Jones, supra*, 54 Cal.4th at p. 353.)

"Section 654 applies when the aspect of a sentence enhancement punishes the exact criminal conduct for which a defendant has been separately convicted and sentenced." (*People v. Buchanan* (2016) 248 Cal.App.4th 603, 616.) In *Buchanan*, the defendant was convicted of possession of a firearm as a felon and possession of narcotics for sale with a section 12022, subdivision (c) enhancement for possession of the same firearm in commission of the narcotics offenses. (*Buchanan*, at p. 606.) The court concluded that section 654 applied because the firearm enhancement pertained to the same possession of the firearm on the same occasion as the narcotics offences and, therefore, "[t]he criminal act for which [the] defendant was convicted and the aspect of the enhancements attached to his sentence were identical." (*Buchanan*, at p. 617.) Accordingly, under section 654, the

17

defendant could be subject "to only one sentence enhancement for use of the firearm in the commission of his narcotics offenses," and the other sentences relating to possession of the firearm must be stayed. (*Buchanan*, at pp. 607, 618, fn. 4.)

Here, too, defendant cannot face punishment for both possessing the firearms as a felon (counts 4 and 5) and section 12022, subdivision (c) enhancements for possession of the same firearms on a single occasion. Because the punishment for the section 12022, subdivision (c) enhancement is greater (§ 12022, subd. (c) [imposing three, four, or five years imprisonment]) than the punishment for possession of a firearm as a felon (§§ 18, 29800, subd. (a) [imposing 16 months, two years, or three years imprisonment]), defendant's concurrent sentence for counts 4 and 5 must be stayed, and we modify the judgment accordingly.

C.  *Section 1170.1 precludes imposition of concurrent sentences for the multiple firearm enhancements attached to counts 1 and 2.*

The People raise a second sentencing issue regarding the two gun enhancements attached to each of counts 1 and 2. The People argue, and the defendant agrees, that under section 1170.1, subdivision (f), punishment may be imposed for only one of the firearm enhancements attached to count 1 and for only one of the firearm enhancements attached to count 2. As noted above, as to count 1, the trial court imposed a consecutive four years for the handgun enhancement and a concurrent four years for the rifle enhancement. As to count 2, the trial court imposed concurrent terms for each of the handgun and rifle enhancements. Under section 1170.1, subdivision (f), this was error.

Section 1170.1, subdivision (f) states, "When two or more enhancements may be imposed for being armed with or using a dangerous or deadly weapon or a firearm in the commission of a single offense, only the

greatest of those enhancements shall be imposed for that offense." In *People v. Jones* (2000) 82 Cal.App.4th 485, 493, the court held it was error for the trial court to impose a sentence enhancement for use of a gun during a robbery and an additional sentence enhancement for use of a knife during the same robbery. The court modified the judgment to stay the imposition of the sentence for the knife-use enhancement. (See *People v. Crites* (2006) 135 Cal.App.4th 1251, 1255 [finding § 1170.1, subd. (f) "prevents execution of sentences for multiple [weapon] enhancements [in the commission of a single offense], but not the procedure of imposing but staying all but the greatest enhancement falling within the statute"].)

We agree with the parties that the trial court should have stayed punishment as to the rifle enhancement attached to count 1 and should have stayed punishment as to the handgun enhancement attached to count 2, and we modify the judgment accordingly. (See *People v. Alford* (2010) 180 Cal.App.4th 1463, 1473 [exercising authority under § 1260 to modify sentence under § 654 rather than remanding for resentencing].)

D.      *Sentencing Credits*

Defendant contends, and the People agree, that the abstract of judgment must be modified to accurately state defendant's presentence custody credit award. As reflected in the trial court's minutes and in the reporter's transcript, the trial court awarded defendant 589 days of confinement credit and 588 of conduct credit for a total presentence custody credit of 1,177 days. However, the abstract of judgment only reflects the 589 days of confinement credit. We further modify the judgment to accurately reflect the trial court's award of 589 days of confinement credit and 588 days of conduct credit, for a total of 1,177 days of presentence custody credits. (See *People v. Scott* (2012) 203 Cal.App.4th 1303, 1324 ["As with other clerical

19

errors, discrepancies between an abstract and the actual judgment as orally pronounced are subject to correction at any time, and should be corrected by a reviewing court when detected on appeal"].)

## DISPOSITION

The judgment is modified as described in this opinion to reflect that the concurrent sentences imposed on the following counts and enhancements are stayed:  (1) the rifle enhancement attached to count 1; (2) the handgun enhancement attached to count 2; (3) count 4; and (4) count 5.  The judgment is further modified to reflect that the defendant was awarded 589 days of confinement credit and 588 days of conduct credits, for a total presentence credit award of 1,177 days.  The trial court is directed to prepare an amended abstract of judgment reflecting these modifications and to forward a copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

_____
Jackson, J.

WE CONCUR:


_____
Petrou, Acting P. J.


_____
Wiseman, J.*

A155368/*People v. Adrian Joseph Ponce*

---

    * Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.